UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| FERDINANT BALLA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No.: 3:14-01150 Judge Sharp |
| KAIROS NETWORK VETERAN SERVICES, LLC; HOWARD JACKSON and DODRICK SMITH, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

After a default judgment on the issue of liability was entered in favor of Plaintiff Ferdinant Balla on his claims against Defendant Kairos Network Veteran Services, LLC, the Court conducted an evidentiary hearing on damages. That hearing was held on August 4, 2016, and Plaintiff was given the opportunity to submit proposed findings of fact and conclusions of law. Those proposed findings and conclusion, filed on October 7, 2016, request damages in the amount of $693,712.66.

### I. Background

Even in the absence of opposition, a request for damages must be based in reality and upon the record. Plaintiff's proposed figure is neither.

Just a few examples give the flavor of Plaintiff's overreaching and failure to shore-up the record:

▸ At what appeared to be the end of counsel's questioning of Plaintiff, the Court asked, "What do they [Kairos] owe you for time and work that you weren't paid?", prompting counsel to mutter, "Ugh." (Tr. Trans. at 35). The Court then stated, "I'm

1

asking him [Plaintiff]. Do you know?", to which Plaintiff responded, "For everything, I believe it would be close to $35,000." (Id.). The Court recessed and, upon reconvening 20-minutes later, counsel characterized Plaintiff's figure as "sort of spit-balling," and stated that he "wanted to walk [Plaintiff] through some of the arithmetic that's relevant to calculating your damages, and see if we can come up with a more precise number." (Id. At 36). Counsel then proceeded to ask Plaintiff a series of leading questions, the net effect of which was to raise Plaintiff's damages estimate nearly twenty-fold.

▸ Plaintiff proposes as a finding that his "uncontradicted testimony was that he worked ninety-six hours per week," and that his "wife confirmed this testimony." (Docket No. 89 at 2-3). While Plaintiff so testified after the recess based upon counsel's question/statement that "your typical work day could be expected to go from 6:30 a.m. to 10:30 p.m.," (Tr. Trans. at 37), Plaintiff originally testified that he would get a phone call setting forth his work schedule sometime between 4:30 and 6:00 a.m., and that he would "work from 6:00 a.m. to whenever the light went out, so it would be sundown," after which he would work on paperwork over dinner. (Id. at 25-26). In his earlier testimony, Plaintiff also acknowledged that sundown from October to March would be around 5:00 or 6:00 p.m., and that, for the remaining months of the year, sundown would be "somewhere closer to 8:00 or 9:00 p.m." (Id. at 25). Even if, as Plaintiff claims, he essentially worked from sunup to sundown, there is no evidence in the record to suggest that he spent 4 ½ to 5 ½ hours a night completing paperwork five months of the year. As for the cited testimony from Ms.

2

Balla, all she said was that Plaintiff would receive phone calls around 5:30 a.m. and as late as 10:00 or 11:00 p.m. , not that her husband worked 16 hours a day, six days a week.

▸ Mrs. Balla testified that Kairos over-reported Plaintiff's 2013 income by $10,000 in the Form 1099 issued to him. When the Court asked for the W2's for that year that would show the amount paid by Kairos and T-Mobile where Plaintiff worked previously, counsel explained that "we didn't put the W-2's into the exhibit folder" (even though the folder contained Plaintiff 2013 tax returns, a Form 1099 for 2013 from Kairos, and W-2's for 2014 and 2015) because "we didn't anticipate a discrepancy[.]" (Id. at 21-22).

▸ Plaintiff also proposes as a finding that he and his wife "incurred unexpected debts, including over four thousand dollars in interest accrued on debts incurred while using credit cards to pay household bills." (Docket No. 89 at 3). Leaving aside that there was no testimony that the Ballas never used credit cards to pay bills before or after Plaintiff left Kairos's employment such that interest charges would be "unexpected," the actual testimony is different from the proposed finding. When asked, "how much interest do you think has accrued on these debts?", Ms. Balla testified, "I honestly have no idea. I would be willing to bet 3 or $4,000." (Tr. Trans. at 22). When asked a similar question, Plaintiff responded, "I would say a very good amount, in my opinion, would be 3 to $4,000." (Id. at 34).

▸ Among other things, Plaintiff seeks "regular pay obligation for the thirteen months he testified he worked for the Defendant." (Docket No. 89 at 5). In actuality,

3

Plaintiff testified that he worked at Kairos from October 2012 to November 2013. Thus, depending upon his start and end dates, Plaintiff may have actually been employed by Kairos for only 11 months.

The Court need go no further on this point other than to observe that, while a thousand dollars may not be a lot to quibble about in the grand scheme of things, and a month here or there might be inconsequential, the point is that Plaintiff is seeking an astronomical amount of money and that request needs to be supported by the evidentiary record. With this in mind, the Court turns to the specific category of damages Plaintiff seeks.

## II. Damages Under the Fair Labor Standards Act ("FLSA")

### A. Backpay

The FLSA generally provides that employers may not require employees to work more than 40 hours per workweek, unless those employees receive overtime compensation at a rate of not less than one-and-one-half times their regular pay. 29 U.S.C. § 207(a)(1). "Calculation of the regular rate is the linchpin of the FLSA overtime requirement[.]" O'Brien v. Town of Agawam, 350 F.3d 279, 294 (1st Cir. 2003).

An employee who seeks to recover unpaid overtime wages under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946). The Act requires that covered employers "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him," 29 U.S.C. § 211(c), and, where an employer fails to keep adequate employment records, an employee may make a prima facie case of overtime violations if by producing "sufficient evidence to show the amount and extent of his work

4

as a matter of just and reasonable inference," Anderson, 328 U.S. at 687–88. However, "'an unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference.'" Ihegword v. Harris Cty. Hosp. Dist., 555 F. App'x 372, 375 (5th Cir. 2014) (citation omitted).

Plaintiff requests "$142, 981.33 in backpay for his Fair Labor Standards Act claim." (Docket No. 89 at 9). This figure includes the "regular pay obligation for thirteen months" of $51,606.88 (less the $17,000 Plaintiff claims to have actually received from Kairos) plus the "overtime obligation of $108,374.45." (Id. 6).

Plaintiff 's "regular pay" request is not adequately supported by the record. Plaintiff testified that he was promised a salary of $4,000 per month, but not paid that amount, and alleged as much in his Complaint. However, Plaintiff also alleged in his Complaint that he "entered into a contract for employment" with Defendant Kairos "on or about the 23rd day of February, 2013," under the terms of which he "was required to 'devote his . . . undivided time and attention and use the utmost of his . . . skills and ability in furtherance' of Kairos' business." (Complaint ¶ 3). This and other language in the Complaints suggest the existence of a written contract setting forth the terms of the agreement between the parties, but no such document was introduced during the evidentiary hearing. What was submitted was a Form 1099 issued to Plaintiff by Kairos showing payment of $33,000 for 2013. Assuming that Plaintiff left at the end of November, this would suggest a salary of $36,000 per year. The Court is unable to reconcile this form with Plaintiff's 2013 tax return which show wages, salaries, and tips of $27,034. However, Mrs. Kairos's testimony that they received $10,000 less than that reported on the Form 1099 is not supported by W-2's other documentary evidence.

Regardless, Plaintiff's "regular pay obligation" request sounds more like a breach of contract

5

than an FLSA claim, particularly since he has not shown that he was paid less than the minimum wage. That leaves Plaintiff's overtime request.

Under the regulations,

> Where the salary covers a period longer than a workweek, such as a month, it must be reduced to its workweek equivalent. A monthly salary is subject to translation to its equivalent weekly wage by multiplying by 12 (the number of months) and dividing by 52 (the number of weeks).

29 C.F.R. § 778.113. Plaintiff's overtime calculation is based upon 56 hours of overtime per week and an overtime rate of $34.62. Doing the math, $4,000 equates to $48,000 a year which, when divided by 52 weeks a year, equates to $932.08 a week (rounded up) or $23.08 an hour for a forty hour week. The overtime rate, calculated at 1½ time the regular rate, would be $34.62.

As previously noted, the record does not support Plaintiff's claimed monthly salary. At best, the record shows that Plaintiff agreed to work for $36,000 per year, which translates to an hourly rate of $17.32 and an overtime rate of $25.98 per hour.

As for the number of hours worked component, this Court has already noted serious problems with the 96 hour per week estimate. Those concerns aside, Plaintiff testified that his job duties were to "cut grass . . . perform wipes, clean-ups, and maintain the properties." (Tr. Trans. at 25). Given the weather in Tennessee, there would be many months in a year when mowing grass would be unnecessary. Further, and perhaps most importantly, Plaintiff's testimony did not comport with the allegations in his Complaint on which Kairos defaulted. In his Complaint, Plaintiff alleged that "most weeks, he personally worked in the neighborhood of or in excess of sixty (60) hours per week." (Docket No. 1, Complaint ¶ 7). This is a far cry from 96 hours a week, week-in, week-out, for months on end.

Having considered the record, the Court finds 20 hours a week in overtime to be reasonable,

if not generous. This results in a overtime damages figure of $29,045.64, based upon the following calculation: $25.98 per overtime hour X 20 hours per week X 4.3 weeks a month X 13 months = $29,045.64.

**B. Liquidated Damages**

In an FLSA case, the "district court . . . has the discretion not to award liquidated damages to a prevailing plaintiff if 'the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938." Elwell v. Univ. Hosps. Home Care Servs., 276 F.3d 832, 840 (6th Cir. 2002) (quoting, 29 U.S.C. § 260). "This burden on the employer is substantial and requires 'proof that [the employer's] failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict." Id. (quoting, McClanahan v. Mathews, 440 F.2d 320, 322 (6th Cir. 1971)). "'In the absence of such proof [, however,] a district court has no power or discretion to reduce an employer's liability for the equivalent of double unpaid wages.'" Id.

Because Kairos is in default and consequently proffered nothing to show that it acted in good faith or on reasonable grounds, Plaintiff is entitled to an additional award of $29,045.64 as liquidated damages.

### III. Damages Under the Tennessee Human Rights Act ("THRA")

**A. Compensatory Damages**

Compensatory damages are "intended to make a plaintiff whole [and] compensate the plaintiff for damage or injury caused by a defendant's wrongful conduct." Meals ex rel. Meals v.

7

Ford Motor Co., 417 S.W.3d 414, 419 (Tenn.2013). Such damages need not be calculated with "'mathematical precision,'" but "must . . . be proven with reasonable certainty." Memphis Light, Gas & Water Div. v. Starkey, 244 S.W.3d 344, 354 (Tenn. Ct. App. 2007). The Court's goal is "to make a fair and reasonable assessment of damages," Riad v. Erie Ins. Exchange, 436 S.W.3d 256, 275 (Tenn. Ct. App. 2013), not to provide a "windfall," Shelby Cnty. Health Care Corp. v. Baumgartner, 2011 WL 303249, at *17 (Tenn. Ct. App. 2011).

   **1.** *Economic Damages*

At the conclusion of his proposed findings, Plaintiff requests economic damages under the THRA in the amount of $57,750.00. Elsewhere, he places his economic loss at $66,000. The latter figure is probably what he meant because his calculations are based on $4,000 in alleged lost interest plus 33 months of back pay at $4,000 per month minus the $70,000 he made since leaving Kairos.

Turning first to interest, as this Court has already suggested, the figure provided by Plaintiff is a wild guesstimate – no more, no less. True, credit card statement were placed in the record but there is no evidence that utilizing credit cards was not Plaintiff's routine practice. Further, and as the Court pointed out to counsel at the hearing, it was incumbent upon Plaintiff to establish damages and the Court was not obligated to sift through the record to find evidence to support the amount requested. No damages will be awarded for lost interest.

As for damages due to job loss, the Court has already determined that a salary of $3,000 per month is supported by the record. Thus, Plaintiff is entitled to an award of $29,000 in economic damages under the THRA for lost wages based on the following calculation: $3,000 X 33 = $99,000 – 70,000 = $29,000.

### B. *Non-Economic Damages*

Plaintiff seeks "$100,000 in non-economic compensatory damages for his [THRA] claim." (Docket No. 89 at 9). At another point, he "seeks compensatory damages in the same amount as his economic damages" (id. at 7), which he calculated as either $57,750.00 or $66,000. Either way, he asserts that "the wrongful conduct in this matter, which included implications that the Plaintiff was affiliated with organized crime, discriminatory pay, and statements that he was 'dirty,' rises beyond the level of that which the Court awarded $20,000 in compensatory damages in Atkins [v. La Quinta, 138 F. Supp.3d 961 (M.D. Ten. Aug. 26, 2014)], but does not rise to the level of the egregious conduct noted in Bailey v. USF Holland, Inc., 526 F.3d 880 (6th Cir. 2008)." (Id.). Plaintiff is right about Bailey, but wrong about Atkins.

As this Court pointed out in Atkins,

> Bailey involved "a wide variety of racially motivated harassment," by numerous actors, some of "which was both serious and potentially dangerous," and included the spraying of racist graffiti and the hanging of nooses on company premises. The offensive conduct lasted six years, and despite sensitivity training and the fact that Plaintiffs "spent years complaining" the statements and conduct continued.

138 F. Supp. 3d at 980. Nothing approaching the untoward conduct asserted in Bailey has been alleged here, let alone proven.

Atkins involved THRA claims by housekeepers who "worked in an environment where inappropriate remarks regarding race were made on a near daily basis." Id. at 976. Notwithstanding rigorous cross-examination by defense counsel, the Court found the housekeepers to be credible witnesses, that their workplace was racially hostile from both a subjective and objective viewpoint, and that they were subjected to a wide-range of racially disparaging remarks, many of which were "downright offensive, and all [of which] were unwelcome." Id. at 976. Even

9

so, the Court awarded compensatory damages ranging from $2,500 to $20,000, depending on the length of employment of a particular housekeeper, and the scope of the harassment.

Plaintiff's testimony, which was not subject to the crucible of cross-examination, hardly suggests the same conditions of employment as those in Atkins, or the mental anguish those employees who had been there the longest suffered. The Court will award $10,000 in non-economic damages on Plaintiff's THRA claims.

### C. *Punitive Damages*

Stating that there is a split of authority as to whether punitive damages are even available under the THRA, Plaintiff nevertheless asks for $250,000 in such damages. That request will be denied.

Plaintiff argues that, "[i]n the absence of controlling authority, and with the issue uncontested by the Defendant, the Court [should] conclude[] . . . in this case [that] punitive damages are available under the THRA. " (Docket No. 89 at 8). However, as this Court has previously observed, "the Tennessee Supreme Court has held that punitive damages [under the THRA] 'are available only in cases involving discriminatory housing practices and malicious harassment," Carver v. Citizens Utilities Co., 954 S.W.2d 34, 35 (Tenn.1997)". Moore v. City of Clarksville, No. 3:10-0141, 2011 WL 2938459, at *8 (M.D. Tenn. July 19, 2011) .

Obviously, this is not a housing discrimination case, and, insofar as Plaintiff's claims could be read to include malicious harassment, he "must show that defendant acted maliciously – that is, with ill-will, hatred, or spite, and also 'demonstrate that the perpetrator intentionally intimidated the plaintiff from freely exercising a constitutional right.'" Swanson v. Summit Med. Grp., PLLC, 2014 WL 2208948, at *4 (E.D. Tenn. May 28, 2014) (quoting, Davidson v. Bredesen, 330 S.W.3d 876, 889

10

(Tenn. Ct. App. 2009). Plaintiff has made no such showing or demonstration - not even close. And, even if punitive damages were available under the THRA generally, Plaintiff has not convinced the Court this is one of "the most egregious of cases" and that Kairos "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly" as required by Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992).

### IV. Attorney's Fees and Costs

Plaintiff is a prevailing party (albeit by default) on both his FLSA and THRA claims. Both statutes allow for the award of *reasonable* attorney's fees and costs. See, 29 U.S.C. § 216(b) ("The court in [an FLSA] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); Smith v. Serv. Master Corp., 592 F. App'x 363, 367 (6th Cir. 2014) ("An award of attorney's fees under § 216(b) is mandatory."); Sneed v. City of Red Bank, 459 S.W.3d 17, 28 (Tenn. 2014) (citing Tenn. Code Ann. § 4-21-311(b) ("The THRA provides broad remedies to prevailing parties, including reinstatement, damages for humiliation and embarrassment, reasonable attorney's fees, and costs of litigation."). Accordingly, Plaintiff will be awarded reasonable attorney's fees and costs upon proper documentation.

### V. Conclusion

On basis of the foregoing, the Court will award Plaintiff $29,045.64 in backpay, plus a like amount in liquidated damages under the FLSA. The Court will also award $29,000 in economic damages and $10,000 in non-economic damages under the THRA.

The combined total of $97,091.28 in damages is bounteous, likely multiples of what any reasonable jury in this district would return, and at the very upper limit of what can be justified under

evidence presented.

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE